STATE OF MISSOURI, Respondent, *v.* A. H. BOGARDUS, Appellant.

### June 12, 1877.

A marksman, to exhibit his skill as such, shot pigeons thrown up into the air. *Held,* that this did not violate the provisions of "An act for the prevention of cruelty to animals" (Sess. Acts 1874, p. 112), which declares it an offence, etc., "needlessly to kill any living creature."

*On motion for a rehearing:* In interpreting a legislative act, the judicial question is, What application did the Legislature intend the words used to have?

APPEAL from St. Louis Court of Criminal Correction.
*Reversed and dismissed.*

J. D. JOHNSON, for appellant.
R. S. MACDONALD, for respondent.

HAYDEN, J., delivered the opinion of the court.

The complainant in this case charges that the defendant " did unmercifully kill certain living creatures by shooting them with a shot-gun, for the purpose of displaying his skill as a marksman, to wit, twenty-five pigeons, contrary to the form of the statute," etc. The defendant was arrested and held to bail on the charge, tried, convicted, and fined $50, and has appealed to this court.

The question in the case involves the construction of the act to be found in the Session Acts of 1874, page 112, entitled, " An act for the prevention of cruelty to animals." It is claimed that an offence was committed under that part of section 1 which provides that " if any person shall needlessly kill any living creature, every such offence shall," etc. The evidence tended to show that at the Abbey Racetrack a man threw up pigeons, two at a time, and that the defendant, in the presence of a number of persons, shot the pigeons in the air, with a gun, to show his skill ; that the birds dropped dead when shot ; that they were furnished by the owners to be shot at ; that pigeons like these are eaten as food, and bought and sold for that purpose ; that they were so eaten when shot.

The object of the act is to prevent unnecessary suffering to animals. Human beings are not included under this expression, but with this exception the act, in its terms, is broad enough to cover all creatures. It is not so material, however, to enquire how low in the order of creation the subjects of this act extend, as it is to ask what is needless mutilation or killing, within the meaning of the act. All needs are comparative. The flesh of animals is not necessary for the subsistence of man, at least in this country, and by some people it is not so used. Yet it would not be denied that the killing of oxen for food is lawful. Fish are not necessary to any one, nor are various wild animals which are killed, and sold in market ; yet their capture and killing are regulated by law. The words " needlessly "

and "unnecessarily" must have a reasonable, not an absolute and literal, meaning attached to them. As it would not be claimed that the angler who catches fish for pastime, and neither sells nor eats them when caught, is within the prohibition of the law, so the marksman who, as an exercise of skill or as a diversion to himself or to others, shoots pigeons, either from a trap or as they fly wild in the woods, does not violate the essential objects of the act. When the prevention of cruelty and suffering is concerned, there is plainly a difference between instantaneous and lingering death. The former is generally, if not always, painless. Yet, in favor of those sports which are considered healthful recreations, and exercises tending to promote strength, bodily agility, and courage, the pain which comes with a lingering death in the lower animals is often disregarded in the customs and laws of humane and highly-civilized peoples. In England an act of Parliament has been passed to restrict vivisection, a practice which has high scientific ends. Yet fox-hunting, which is a cruel pastime, would no doubt be upheld by the common law. It is certainly the policy of every government to encourage those recreations which serve as manly exercises, and yet do not necessarily lead to protracted pain in the lower animals. The efficiency of the services which the citizen is called upon to render to the State, in exigencies, may largely depend on the qualities acquired in manly sports, and from some of the most attractive of these a certain amount of injury to dumb animals seems inseparable.

In the present case there was no mutilation, or any thing approaching to it. The birds were killed in a more humane way than by wringing their necks, which is an ordinary method of destroying life in pigeons, when they are killed merely with a view to their being eaten. Though we think that the 1st section of the act can not properly receive the construction placed upon it by the appellant, by which its operation would be confined to beasts of burden and ani-

mals *ejusdem generis*, we are of opinion that in the present
case there was no violation of the act, and that the appel-
lant's instruction to the effect that the evidence was insuffi-
cient to sustain the charge should have been given. Ac-
cordingly, the judgment will be reversed and the complaint
dismissed. All the judges concur.

On motion for a rehearing, LEWIS, P. J., delivered the
opinion of the court.

Appellant files his motion for a rehearing of this cause,
with a brief assigning reasons why it should be granted.
The points and arguments are the same that were presented
on the first submission, and gain no strength by the ad-
dition of some hasty comments on the action of the court.

The writer of this opinion concurred in the judgment of
reversal, but did not then consider it of sufficient importance
to express his dissent from some of the reasoning by which it
was supported. The conclusion that the acts charged against
defendant were not within the legislative intent in "An act for
the prevention of cruelty to animals" remains undisurbed.

However distasteful to the sympathies, the prejudices, or
the preferences of the judge who delivers an opinion, his
first duty is to declare the law according to the meaning of
the law-maker. This he must ascertain by accustomed
lights, whose guidance is endorsed by the experience of cen-
turies. The current of public and social events, the drift
of popular opinion, and the universal or prevailing estimate
of specific acts among men at the time of the adoption of a
statute, are, in many cases, matters of indispensable con-
sideration in judicial interpretation. This is eminently true
when a statutory general expression occurs whose applica-
tion to a particular subject may be accepted, rejected, or
modified, according to the moral impressions of him who
is to make it. Such an expression appears in the terms
"needlessly killing." Few words in our language have a
more ambulatory significance than the word "needless."

There was, in England, a time when prize-fighting was held in the highest general estimation. The nobility, the gentry, and even the clergy, were among its enthusiastic patrons. If, during that period, Parliament had passed an act making it penal for persons to engage publicly in any brutal, disgusting, or demoralizing conflict, no court in the kingdom would have held this to include " the manly art of self-defence." Why? Because, in the existing state of cultured opinion, it could not be supposed that the Parliament considered this ennobling exhibition as either brutal, disgusting, or demoralizing. The test of judicial interpretation would have been, not whether the judge considered the descriptive words appropriate to the thing done, but whether the legislative mind intended such an application of them. In the altered condition of Christian public sentiment at the present day, an act passed in the very same words would be held as directly aimed at that execrable practice, now happily denied any civilized toleration. This, however, not because of the judge's disposition to reprehend it, but because of a weighty presumption that the Legislature meant so to do.

The universal love of so-called " sports" which involve the destruction of animal life cannot now be ignored in a search after the legislative meaning in the act before us. Such diversions are not always resorted to for the needs of human sustenance. Yet they are not considered " needless" for man's enjoyment of his legitimate dominion over the brute creation. The individual who finds a healthful recreation in gunning or fishing can hardly be told that this must not be gained at the expense of his dumb subjects. The plea for life which he might hear, if the gift of speech were not denied, would have little weight against even the momentary triumphs of the marksman who brings down his game. It may be that the day will come when sentiments of mercy and humanity shall have so far advanced, with the progress of refining thought, that the man who can so estimate a fleeting satisfaction above a life, however lowly,

which only Omnipotence can bestow, will be regarded as exceptionally selfish and cruel. But no such feeling prevails to-day. Nor can any such be supposed as a basis for the interpretation of a legislative enactment.

It could never be the policy of a good government to suppress innocent manly exercises, which tend either to promote physical superiority or to stimulate the courage and the consciousness of individual power, which, in times of public peril, so often prove the only means of safety. But in this general truth I fail to find for the acts here charged the moral justification implied in the able opinion heretofore delivered in this cause. All possible superiority in marksmanship could be quite as easily attained without the sacrifice of any life. Courage is practically cultivated nowhere but in the view of danger, real or supposed. In all the "manhood" that may be devoted to bloody conquests over defenceless creatures, already captive, we cannot feel sure of finding the material that would best serve to defend the State. When no higher motive is apparent in the conqueror than that of "displaying his skill as a marksman," it may be doubted that his example is of a largely more elevating tendency than was that of the ancient tyrant who plucked out the eyes of a slave in order to show the deftness of his fingers. But, execrable as the exhibition may have been to the humane instincts which originated this prosecution, or however revolting to a judge who might be called upon to condemn it, the rule of interpretation already exemplified seems to leave no escape from the conclusion announced in our first judgment. An act such as this, identified in general features with popular diversions which, however indifferent to the value of brute life, have never been held "needless" for man's lawful delectation, could not have been within the legislative contemplation when this indefinite prohibition was made a law. For this reason I concur with my brother judges in overruling the motion for a rehearing.